**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**JULIE ANN JOHNSON,**

        **Plaintiff,**

**v.**                                                    **Case No.: 2:15-cv-07929**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social**
**Security Administration,**

        **Defendant.**

## MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently before the Court on the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 14). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 7, 8). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court **FINDS** that the decision of the Commissioner is not supported by substantial evidence, and therefore should be **REVERSED** and **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this opinion.

## I.  Procedural History

Plaintiff Julie Ann Johnson ("Claimant") filed an application for SSI benefits on

August 4, 2011, alleging a disability onset date of January 27, 2010 due to "mental depression, partically [*sic*] blind, anxiety, migraines, [and] high blood pressure." (Tr. at 213, 240). The Social Security Administration ("SSA") denied the application initially and upon reconsideration. (Tr. at 88-92, 99-101). Claimant subsequently filed a written request for an administrative hearing, which was initially held on January 30, 2013 before the Honorable Jerry Meade, Administrative Law Judge ("ALJ"). (Tr. at 102, 27-48). The ALJ continued the hearing so that Claimant could submit updated medical records and undergo psychiatric and visual consultative examinations. (Tr. at 46-47). On December 9, 2013, a supplemental hearing was held before the ALJ. (Tr. at 49-64). By written decision dated January 14, 2014, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-21). The ALJ noted in his decision that Claimant had previously filed an application for SSI on February 8, 2010, which was denied by an administrative law judge on June 13, 2011. (Tr. at 11). Because Claimant had not submitted new and material evidence to support reopening the prior decision, the ALJ determined that the period under adjudication was June 14, 2011, the day after Claimant's previous application was denied. (*Id.*) The ALJ's decision became the final decision of the Commissioner on April 17, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

On June 18, 2015, Claimant timely filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and Transcript of the Proceedings on August 26, 2015. (ECF Nos. 9, 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 11, 14). Accordingly, this matter is ripe for resolution.

## II.     Claimant's Background

Claimant was 36 years old on her alleged disability onset date and 40 years old at the time of the ALJ's decision. (Tr. at 21, 213). She completed high school and is able to communicate in English. (Tr. at 239, 241). Claimant previously worked as a cook and dietary aide in a nursing home. (Tr. at 241, 248).

## III.    Summary of ALJ's Findings

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving disability, defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A). The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the next step is to

3

ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to establish, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review." 20 C.F.R. § 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal

limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. *Id.* § 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

*Id.* § 416.920a(e)(2).

In this case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since July 26, 2011, the date of her application. (Tr. at 13, Finding No. 1). Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of vision impairment, migraine headaches, major depressive disorder, and generalized anxiety disorder. (Tr. at 13-14, Finding No. 2). The ALJ also considered Claimant's hypertension, back pain, neck pain, shoulder pain, obesity, and reflux, but found these conditions to be nonsevere. (Tr. at 14).

At the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination, did not meet or equal the level of severity of any

impairment contained in the Listing. (Tr. at 14-16, Finding No. 3). Consequently, the ALJ determined that Claimant possessed the RFC to:

> [P]erform a full range of work at all exertional levels but with the following nonexertional limitations: she can never climb and can occasionally balance, stoop, crouch, kneel and crawl. She should avoid all exposure to hazards such as moving machinery and unprotected heights. The claimant is limited to simple repetitive tasks and can have occasional interaction with the public, coworkers and supervisors.

(Tr. at 16-19, Finding No. 4). Based upon the RFC assessment, the ALJ determined at the fourth step that Claimant was unable to perform any past relevant work. (Tr. at 19, Finding No. 5). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine if she would be able to engage in substantial gainful activity. (Tr. at 19-21, Finding Nos. 6-9). The ALJ considered that (1) Claimant was born in 1973 and was defined as a younger individual; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination given that the Medical-Vocational Rules supported a finding that the Claimant was "not disabled," regardless of her job skills. (Tr. at 19-20, Finding Nos. 6-8). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ concluded that Claimant could perform jobs that exist in significant numbers in the national economy. (Tr. at 20-21, Finding No. 9). Specifically, the ALJ found that Claimant could work at the medium level as a night cleaner or laundry worker, at the light level as a garment bagger or hotel maid, and at the sedentary level as an inspector or sorter. (Tr. at 20). Consequently, the ALJ decided that Claimant had not been disabled as defined in the Social Security Act from July 26, 2011 through the date of the ALJ's decision. (Tr. at 21, Finding No. 10).

## IV.  **Claimant's Challenge to the Commissioner's Decision**

Claimant raises one challenge to the Commissioner's decision. She contends that the ALJ failed to properly weigh the opinion of Lester Sargent, M.A., an examining consultative psychologist. (ECF No. 11 at 4-6). Claimant points out that Mr. Sargent diagnosed her with major depressive disorder, recurrent, severe, and generalized anxiety disorder. (*Id.* at 5). Mr. Sargent opined that Claimant's prognosis was poor. (*Id.*) According to Claimant, Mr. Sargent found that Claimant experienced several moderate restrictions in her ability to perform work-related activities along with marked restrictions in her ability to make judgments on complex work-related decisions, to respond appropriately to usual work situations or changes in a routine work setting, and to understand, remember, and carry out complex instructions. (*Id.* at 5-6). Claimant argues that the ALJ assigned "little weight" to Mr. Sargent's opinion "without reasonable justification." (*Id.* at 6). Claimant insists that, at a minimum, the ALJ should have made further inquiry of Mr. Sargent if the ALJ found his opinion to be unclear. (*Id.*) Claimant emphasizes the importance of Mr. Sargent's opinion by citing the vocational expert's testimony that Claimant would be unable to engage in substantial gainful activity if the limitations in Mr. Sargent's opinion were assigned controlling weight. (*Id.*)

In response, the Commissioner argues that substantial evidence supports the weight assigned to Mr. Sargent's opinion by the ALJ. (ECF No. 14 at 8). The Commissioner asserts that the findings of Mr. Sargent's mental status examination did not corroborate his opinions. (*Id.* at 9). Moreover, the Commissioner contends that the findings of Claimant's mental health treaters were unremarkable, which justified assigning "little weight" to Mr. Sargent's "restrictive opinion." (*Id.* at 9-10). In addition, the Commissioner insists that other medical opinion evidence and Claimant's reported

7

activities of daily living belie Mr. Sargent's opinion regarding Claimant's mental limitations. (*Id.* at 10).

## V.   <u>Relevant Medical Records</u>

The Court has reviewed the transcript of proceedings in its entirety, including the medical records in evidence, but has confined its summary of Claimant's treatment records and evaluations to those entries most relevant to the issue in dispute.

### A. Mental Health Treatment Records

Claimant received mental health treatment at Prestera Centers for Mental Health ("Prestera"). On December 10, 2010, Claimant was seen by Kevin White, M.A., for the purpose of assessing her current level of functioning and to determine whether her treatment needs were being met at the current level of care. (Tr. at 308-09). Mr. White noted that Claimant presented with mild anxiety, distractibility, guilt, low energy, feelings of hopelessness or helplessness, and altered sleep patterns, although she described her sleep as "fair to good." (Tr. at 308). Claimant informed Mr. White that she was taking her medication as prescribed with good results. (*Id.*). She also told Mr. White that she was "doing a whole lot better than [she] was," and that she gave herself an "A+" for changing her attitude. (*Id.*) Mr. White observed that Claimant's symptoms seemed to have a "relatively limited impact" on her daily functioning. (*Id.*) He added that Claimant had recently received Medicaid benefits, and as such, should be able to access "needed healthcare." (*Id.*). Mr. White advised Claimant to continue to treat with Dr. Belgrave for medication management, as well as periodic psychiatric evaluations. (*Id.*) In addition, Mr. White discontinued psychotherapy as Claimant had shown significant improvement with her coping skills and a reduction in mood symptoms. (*Id.*) Claimant's diagnosis was dysthymic disorder, and major depressive disorder, recurrent, moderate.

(Tr. at 309). She was assigned a Global Assessment of Functioning ("GAF") score of 60.[1] (*Id.*).

Claimant returned to Prestera on February 10, 2011 for a psychiatric review. (Tr. at 307). Claimant informed her treater that she was "doing ok." (*Id.*) The treater noted that Claimant had a history of depressed mood, insomnia, and anhedonia. (*Id.*) The treater recorded that Claimant was cooperative with full affect and normal motor behavior. (*Id.*) Claimant's remote, recent, and immediate memory were intact, and her concentration and calculation were fair. (*Id.*) The treater observed that Claimant's intelligence was average and her thought process was linear. (*Id.*) Claimant was diagnosed with major depressive disorder, recurrent, moderate. (*Id.*) She was given a GAF score of 65, which indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Diagnostic Statistical Manual of Mental Disorders*, Am. Psych. Assoc., 34 (4th ed. 2002) ("DSM-IV"). Claimant's treater opined that her prognosis was fair. (*Id.*) She was continued on Celexa and Ambien. (*Id.*)

Claimant returned to Prestera on April 14, 2011 and reported that she continued to do "ok." (Tr. at 303). Upon examination, Claimant presented with an even mood and full affect. (*Id.*) Claimant's diagnosis and GAF score remained the same, and she was

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Am. Psych. Assoc., 32 (4th ed. 2002) ("DSM-IV"). On the GAF scale, a higher score correlates with a less severe impairment. The GAF scale was abandoned as a measurement tool in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM-5"), in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at 16. A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

advised to continue her medication regimen. (*Id.*)

Claimant again visited Prestera on June 9, 2011. (Tr. at 304). She stated that she was doing "ok." (*Id.*) Her treater checked boxes indicating that there was no change in her mental status examination from her prior appointment. (*Id.*) Claimant's diagnosis and GAF score remained the same. (*Id.*)

On July 12, 2011, Claimant was taken to St. Mary's Medical Center in Huntington, West Virginia for a drug overdose and suicide attempt. (Tr. at 296-98). Claimant had ingested a mixture of medications; however, no toxic symptoms were noted. (Tr. at 296). She was seen by Lyndsai McClasky, RN, and Tim Daly, M.D. (Tr. at 298, 302). Claimant reported experiencing situational issues with her family and being recently denied for disability benefits. (Tr. at 296, 301). Claimant stated that she had been depressed and upset with suicidal thoughts. (Tr. at 296). A physical examination was deemed normal, and toxicology screens were negative. (Tr. at 297). A psychiatric intake examination revealed that Claimant's mood was depressed and her affect was flat. (Tr. at 301). Claimant's attitude was cooperative and her thought process was normal. (*Id.*) At the time of the evaluation, she denied suicidal ideation or plans. (*Id.*) Claimant told Ms. McClasky that her depression at that time was "a little bit but not bad," and both her sleep and appetite were good. (*Id.*) Claimant declined inpatient treatment. (*Id.*) Ms. McClasky noted that Claimant attempted suicide four years earlier when she was denied SSI. (*Id.*) Claimant was assessed with intentional overdose and depression. (Tr. at 297). She was discharged with instructions to follow up at Prestera. (Tr. at 298).

Claimant followed up at Prestera on July 14, 2011, informing her treater that she had not been doing well and had taken an overdose of pills, which precipitated her visit to St. Mary's. (Tr. at 305). Claimant denied suicidal ideation at the time of her

appointment. (*Id.*) Her treater recorded that mental status examination findings were unchanged from her last visit. (*Id.*) Claimant's diagnosis remained the same, and she was prescribed Vistaril. (*Id.*)

Claimant returned to Prestera on August 18, 2011 and reported that she was doing better. (Tr. at 306). Claimant exhibited a full affect, and she denied any suicidal or homicidal ideation. (*Id.*) Claimant was assigned a GAF score of 60 and continued on her medication regimen. (*Id.*)

On August 25, 2011, Claimant presented to Lincoln County Primary Care Center for treatment and management of hypertension, headaches, and depression. (Tr. at 343-45). Gregory Elkins, M.D., noted that, since Claimant's last evaluation, her depression symptoms were "worse than baseline." (Tr. at 343). Claimant reported good medication compliance and described mild current psycho-social stressors. (*Id.*) Upon psychiatric examination, Claimant was alert and oriented. (Tr. at 344). Her posture and psychomotor activity were unremarkable. (*Id.*) Dr. Elkins observed that Claimant's mood was euthymic, and her affect was broad and appropriate to content. (*Id.*) Claimant exhibited no obvious hallucinations, delusions, obsessions, compulsions, or other abnormal thought processes. (*Id.*) Dr. Elkins recorded that Claimant's speech was normal, and her judgment and insight were intact. (*Id.*) Claimant was assessed with hypertension, hyperlipidemia, depressive disorder, and migraine headache. (Tr. at 345). Dr. Elkins prescribed amitriptyline (Elavil) and paroxetine (Paxil) for Claimant's depressive symptoms. (*Id.*)

Claimant called Dr. Elkins on September 14, 2011 and reported that Paxil caused her to feel jittery, nervous, and grouchy. (*Id.*) Dr. Elkins discontinued Paxil and provided a prescription for sertraline (Zoloft). (*Id.*)

11

Claimant returned to Dr. Elkins on September 22, 2011. (Tr. at 347-48). Claimant reported no side effects or problems with taking Zoloft. (Tr. at 347). Dr. Elkins' findings concerning Claimant's mental status remained unchanged. (Tr. at 348). She was diagnosed with depressive disorder and hypertension, and Dr. Elkins informed her to continue with her treatment plan. (*Id.*)

On October 24, 2011, Dr. Elkins observed that Claimant's depression had improved since her last visit. (Tr. at 349). Claimant reported good medication compliance and moderate psycho-social stressors. (*Id.*) She informed Dr. Elkins that she was not falling asleep until the early morning hours and that she slept better when prescribed Ambien. (*Id.*) Claimant's mental status examination was unremarkable. (Tr. at 350). Dr. Elkins prescribed Ambien and discontinued Elavil. (Tr. at 350-51).

On March 29, 2012, Claimant presented to Lincoln County Primary Care in order to establish patient care with a new physician, Kevin Milam, M.D. (Tr. at 383-84). Claimant told Dr. Milam that she felt fine and had no new complaints. (Tr. at 383). She indicated that she continued to have trouble with sleep; however, Ambien gave her some relief. (*Id.*) Upon examination, Claimant was oriented with proper affect. (*Id.*) Dr. Milam recorded that Claimant's insight and judgment were good. (*Id.*) He also noted that claimant's memory was unremarkable. (*Id.*) Claimant was assessed with depressive disorder and sleep disorder. (Tr. at 384). Dr. Milam prescribed Trazodone for Claimant's sleep disorder. (*Id.*)

On May 3, 2012, Claimant visited George McKay, M.D., at Lincoln County Primary Care complaining of frontal headaches. (Tr. at 387-88). Dr. McKay found Claimant to be alert and oriented with no obvious psychopathology. (Tr. at 388).

Claimant again treated with Dr. Milam on July 31, 2013. (Tr. at 497-99). Dr.

Milam noted that Claimant had a history of anxiety and depression; however, Claimant reported that her symptoms had improved. (Tr. at 497). Claimant stated that she was able to maintain relationships and her symptoms did not interfere with her activities of daily living. (*Id.*) Claimant indicated that her mood, appetite, and energy were good. (*Id.*) She denied experiencing anxiety, crying spells, panic, isolation, or apathy. (*Id.*) She continued to complain of sleeping problems, for which she took medication. (Tr. at 497-98). Upon mental status examination, Claimant displayed good insight and judgment with a normal mood and affect. (Tr. at 498). She was oriented, active, and alert. (*Id.*) Dr. Milam observed that Claimant's recent and remote memory were normal. (*Id.*) Claimant was assessed with depressive disorder, not elsewhere classified, and insomnia. (*Id.*) Claimant's medication regimen for depression and insomnia included Zoloft and Ambien. (Tr. at 497).

Claimant returned to Dr. Milam on August 20, 2013 for a complaint of migraines. (Tr. at 490-92). Dr. Milam observed that Claimant's insight was good, and her mood and affect were normal. (Tr. at 491). Dr. Milam recorded that Claimant was oriented, active, and alert. (*Id.*)

### B. Consultative Evaluations and Opinion Evidence

On September 26, 2011, Frank Roman, Ed.D., completed a Psychiatric Review Technique. (Tr. at 318-31). Dr. Roman opined that Claimant had a nonsevere affective disorder in the form of mild depression. (Tr. at 318, 321). Dr. Roman concluded that Claimant experienced mild limitation in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. at 328). He determined that Claimant had no episodes of decompensation of extended duration. (*Id.*) Dr. Roman noted that the evidence did not establish the paragraph "C" criteria for

13

Listing 12.04. (Tr. at 329). In the Consultant's Notes section of the form, Dr. Roman summarized treatment records from St. Mary's and Prestera. (Tr. at 330). Dr. Roman also noted that an administrative law judge had previously found that Claimant did not have an impairment or combination of impairments that would significantly limit her ability to perform basis work activities. (*Id.*) In addition, Dr. Roman summarized a May 23, 2011 medical source statement from a nurse practitioner, which stated that Claimant experienced moderate limitation in her ability to ability to make judgments on complex work-related decisions and to understand, remember, and carry out complex instructions. (*Id.*) Dr. Roman noted that Claimant reported she was unable to function due to her depression. (*Id.*) For example, Claimant denied being able to cook or clean, and she indicated that she needed reminders to change clothes or bathe. (*Id.*) Dr. Roman found Claimant to be only partially credible. (*Id.*) He remarked that Claimant stopped working as a dietary aid in 2001 because she did not like her job and that she was able to care for her two children. (*Id.*) He concluded that there was little evidence to support the severe depression reported by Claimant. (*Id.*)

Philip E. Comer, Ph.D., completed a Psychiatric Review Technique on November 14, 2011. (Tr. at 352-65). Dr. Comer opined that Claimant's depressive disorder was nonsevere. (Tr. at 352, 355). Like Dr. Roman, Dr. Comer determined that Claimant experienced mild limitation in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. at 362). He also found that Claimant had no episodes of decompensation of extended duration and did not meet the paragraph "C" criteria for Listing 12.04. (Tr. at 362-63). In the Consultant's Notes section, Dr. Comer summarized treatment records from Lincoln County Primary Care Center and cited Dr. Roman's Psychiatric Review Technique in support of his opinion.

(Tr. at 364). Additionally, Dr. Comer noted that Claimant could prepare sandwiches, do laundry once each week, go outside each day, drive, shop for food, and spend time with her family. (*Id.*) Ultimately, Dr. Comer opined that Claimant's statements regarding the severity of her limitations were not fully supported by the evidence in Claimant's file. (*Id.*) Dr. Comer concluded that Claimant "appears to have the mental/emotional capacity for work[-]like activity commensurate with her educational level." (*Id.*)

On December 27, 2012, Claimant underwent a Psychological Evaluation by Rachel Arthur, M.A., who was supervised by Michelle Aliff, M.S. (Tr. at 405-08). Claimant complained of feeling depressed "a couple days per week" beginning in 2006 due to "financial situations and a lot of stress." (Tr. at 405). Claimant described a lack of interest, isolation, poor appetite, sleep issues, loss of energy, recurrent thoughts of death, suicidal ideations without intent, irritability, and feelings of helplessness, hopelessness, guilt, or worthlessness. (*Id.*) She also reported significant anxiety, which likewise began in 2006, with symptoms including excessive worry, restlessness, feeling on edge, tiring easily, and muscle tension. (*Id.*) She informed Ms. Arthur that she experienced anxiety even when she was not feeling depressed. (*Id.*) She described two prior psychiatric hospitalizations. (*Id.*) At the time of the evaluation, Claimant was not undergoing counseling. (*Id.*) She stated that counseling was somewhat helpful in the past and that her current psychotropic medications (Zoloft and Vistaril) were somewhat beneficial. (*Id.*)

Claimant indicated that she was married and had two teenage children, with whom she had positive relationships. (Tr. at 406). Regarding activities of daily living, Claimant remarked that she had no energy and "struggl[ed] through the day trying to get things done." (*Id.*) Claimant could perform self-care tasks independently, except

15

when severely depressed. (*Id.*) She was also able to clean, cook simple meals, drive, shop, and handle her own finances. (*Id.*) She stated that she enjoyed no hobbies, did not attend social gatherings, and had very few friends other than family. (*Id.*)

Upon mental status examination, Ms. Arthur noted that Claimant was cooperative with adequate eye contact. (*Id.*) She observed that Claimant interacted in an appropriate fashion. (*Id.*) Claimant's speech was relevant and coherent, and her responses were appropriate, though limited. (*Id.*) Ms. Arthur recorded that Claimant's mood was anxious and her affect somewhat restricted. (*Id.*) Claimant's thought content and thought process were within normal limits. (*Id.*) Ms. Arthur opined that Claimant's insight was limited and her judgment was moderately deficient. (*Id.*) While Claimant's immediate and remote memory were within normal limits, her recent memory was markedly impaired. (*Id.*) Claimant's concentration appeared to be moderately deficient based on a Digit Span Subtest score. (*Id.*) Claimant exhibited normal psychomotor activity. (*Id.*) Ms. Arthur administered the Beck Depression Inventory, Second Edition, which revealed that Claimant was severely depressed. (Tr. at 406). Claimant was also given the Beck Anxiety Inventory and scored in the severe range on that test as well. (Tr. at 407).

Ms. Arthur assessed Claimant with depressive disorder, not otherwise specified, and generalized anxiety disorder. (*Id.*) She assigned a GAF score of 55. (*Id.*) Ms. Arthur opined that Claimant's prognosis was fair and might improve with appropriate treatment. (Tr. at 408). Ms. Arthur noted that Claimant lacked insight into her emotional issues and recommended individual and group psychotherapy to improve her overall functioning. (*Id.*) Ms. Arthur also indicated that Claimant may benefit from psychotropic medication, such as an antidepressant. (*Id.*)

16

On March 12, 2013, Lester Sargent, M.A., completed an Adult Mental Status Examination for the West Virginia Disability Determination Service. (Tr. at 435-40). Claimant stated that she was diagnosed with an eye disease that left her blind in her left eye and that she did not know whether she was going to lose vision in her right eye. (Tr. at 436). This uncertainty caused her to cry often and feel depressed. (*Id.*) She told Mr. Sargent that she was not happy and had been depressed most of her life. (*Id.*) She indicated worrying constantly and reported a prior suicide attempt in 2011. (*Id.*) Claimant asserted that her depressive symptoms included loss of interest in activities, crying episodes, sleep issues, pessimism, anger outbursts, and feelings of worthlessness, failure, guilt, or helplessness. (*Id.*) She stated that these symptoms had significantly increased over the previous several months. (*Id.*)

Mr. Sargent observed that Claimant was cooperative during the evaluation, but had poor eye contact. (*Id.*) Claimant's speech was coherent and connected. (*Id.*) She was fully oriented with a depressed mood and restricted affect. (Tr. at 438). Claimant's thought process and thought content were normal. (*Id.*) Mr. Sargent recorded that Claimant's judgment was moderately deficient and her insight was poor. (*Id.*) He noted evidence of mild psychomotor retardation. (*Id.*) Claimant's immediate memory was normal; however, Claimant's recent memory was severely deficient based upon her inability to recall any of four words after a five-minute delay. (*Id.*) Her remote memory was found to be mildly deficient based upon her ability to recall personal history details. (*Id.*) Mr. Sargent determined that Claimant's concentration was severely deficient as result of her Digit Span Subtest score. (*Id.*) He also concluded that Claimant's persistence was mildly deficient and her pace was slow. (*Id.*)

Mr. Sargent opined that Claimant's social functioning was severely deficient

based on her interactions during the evaluation. (*Id.*) He also noted that Claimant rarely traveled to the store, ran errands, or dined out. (Tr. at 439). She seldom visited with friends or family members and reported no close friends. (*Id.*) She did not attend social functions, and her only hobby was taking care of her pets. (*Id.*) In describing a typical day, Claimant stated that she helped with household chores, bathed, watched television, talked with her husband, and ate meals. (*Id.*)

Mr. Sargent assessed Claimant with major depressive disorder, recurrent, severe, without psychotic features, and generalized anxiety disorder. (Tr. at 438). He opined that Claimant's prognosis was poor. (Tr. at 439). He determined that Claimant was capable of managing any benefits that might be awarded to her. (*Id.*)

That same day, Mr. Sargent completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. at 441-44). Mr. Sargent found that Claimant was moderately limited in her ability to make judgments on simple work-related decisions, and to understand, remember, and carry out simple instructions. (Tr. at 441). Moderate limitation was defined by the form as: "There is more than a slight limitation in this area, but the individual is still able to function satisfactorily." (*Id.*) Mr. Sargent also opined that Claimant was markedly limited in her ability to make judgments on complex work-related decisions, and to understand, remember, and carry out complex instructions. (*Id.*) Marked limitation was defined as: "There is serious limitation in this area. There is a substantial loss in the ability to effectively function." (*Id.*) In support of his conclusions, Mr. Sargent cited Claimant's low average to borderline cognitive functioning, poor insight, moderately impaired judgment, severely impaired concentration, mildly impaired immediate memory, and severely impaired short-term memory. (*Id.*) Mr. Sargent also opined that Claimant was moderately limited in her

ability to interact appropriately with the public, supervisors, and co-workers. (Tr. at 442). In addition, Mr. Sargent determined that Claimant was markedly limited in her ability to respond appropriately to usual work situations and to changes in a routine work setting. (*Id.*) Mr. Sargent based these conclusions on Claimant's major depressive disorder, generalized anxiety disorder, and other ailments, including eye disease, headaches, back pain, and difficulty breathing. (*Id.*)

On May 23, 2013, Charles D. Auvenshine, Ph.D., completed a Medical Interrogatory form related to Claimant's mental limitations. (Tr. at 469-73). After reviewing the record, he opined that Claimant experienced mild limitation in activities of daily living, and moderate limitation in maintaining social functioning as well as maintaining, concentration, persistence, or pace. (Tr. at 470). Dr. Auvenshine indicated that Claimant experienced no episodes of decompensation of extended duration. (*Id.*) Dr. Auvenshine concluded that, although Claimant suffered from an affective disorder and anxiety-related disorder, the evidence did not support that Claimant's disorders were severe. (*Id.*) He noted that Claimant's hospitalization record in July 2011 for an overdose indicated she was not confused, paranoid, or suffering delusions. (*Id.*) He also emphasized that Claimant had a normal mood and affect with normal speech at the time that she left the care of St. Mary's. (*Id.*) Dr. Auvenshine determined that Claimant's mental disorders, considered singly and in combination, did not meet or medically equal the criteria for any impairment in the Listing. (Tr. at 471). As such, Dr. Auvenshine rendered an opinion regarding Claimant's mental ability to perform work. (Tr. at 473). He indicated that Claimant could "probably" perform her past work as a restaurant waitress or dietary aide at a nursing home, if she were "appropriately medicated." (*Id.*) Further, Dr. Auvenshine remarked that Claimant was capable of performing "a wide

range of simple, repetitive tasks at the sedentary or light level." (*Id.*)

## VI.   **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the United States Court of Appeals for the Fourth Circuit defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.   Discussion

Claimant argues that the ALJ failed to assign appropriate weight to Mr. Sargent's opinion concerning Claimant's functional limitations. She insists that, at minimum, the ALJ should have made further inquiry of Mr. Sargent regarding his findings and opinions. Claimant contends that the ALJ's analysis of Mr. Sargent's opinion is pivotal given the vocational expert's testimony at the administrative hearing that, if Mr. Sargent's opinion were assigned controlling weight, Claimant would be unable to perform any work that exists in significant numbers in the national economy. Claimant accuses the ALJ of "opinion fishing" by obtaining the opinion of Dr. Auvenshine, which was detrimental to Claimant's disability claim, "for the purpose of discrediting [Mr. Sargent's] opinion." (ECF No. 11 at 6).

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 416.927(a)(2). Title 20 C.F.R. § 416.927(c) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §

21

416.927(c)(2). In the absence of a treating physician's opinion that has been afforded controlling weight, the ALJ must analyze and weigh all of the medical source opinions in the record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.[2] *Id.* § 416.927(c)(2)-(6). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner, however, are treated differently than other medical source opinions. Social Security Ruling ("SSR") 96-5p, 1996 WL 374183. In both the Regulation and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;

---

[2] Although 20 C.F.R. § 416.927(c) provides that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the Regulation does not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the Regulation mandates only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* § 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 (stating that when a decision is not fully favorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014).

4. How the vocational factors of age, education, and work experience apply; and

5. Whether an individual is "disabled" under the Act.

*Id.* at \*2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at \*2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at \*3.

Here, the ALJ summarized Mr. Sargent's consultative examination findings and opinion in the RFC discussion. (Tr. at 18). The ALJ recognized that Mr. Sargent concluded Claimant experienced moderate limitation in her ability to make judgments on simple work-related decisions; to understand, remember, and carry out simple instructions; and to interact appropriately with the public, supervisors, and coworkers. (*Id.*) The ALJ also acknowledged that Mr. Sargent opined Claimant's concentration was severely impaired and that she was markedly limited in her ability to make judgments on complex work-related decisions, and to understand, remember, and carry out complex instructions. (*Id.*) The ALJ assigned "little weight to the marked limitations as set forth by [Mr. Sargent], as they are vague, excessive in nature and are not consistent with the objective medical evidence of record." (*Id.*)

23

The ALJ's RFC discussion also outlined other evidence pertinent to Claimant's mental limitations. The ALJ noted that Claimant was diagnosed with anxiety and depression and took psychotropic medication prescribed by her primary care physician. (Tr. at 17). The ALJ acknowledged that Claimant was treated for a drug overdose and suicide attempt at St. Mary's Medical Center in July 2011. (*Id.*) Claimant then followed up at Prestera, where she was diagnosed with depressive disorder and dysthymic disorder; however, the ALJ found that the Prestera treatment records reflected "significant improvement" in her depressive disorder, which led to the discontinuation of psychotherapy. (*Id.*) The ALJ indicated that Claimant's GAF scores during her treatment at Prestera ranged from 60-65, which evinced "mild to moderate symptoms." (Tr. at 17-18). In addition, the ALJ summarized information from Ms. Arthur's December 2012 evaluation of Claimant. (Tr. at 18). Specifically, the ALJ emphasized Claimant's statements to Ms. Arthur that she was not receiving mental health treatment at the time of the evaluation and that she did not experience "daily depression." (Tr. at 18). The ALJ remarked that Ms. Arthur diagnosed major depressive disorder and generalized anxiety disorder, and she assigned a GAF score of 55, which, according to the ALJ, indicated "no more than moderate limitation." (*Id.*) The ALJ reviewed Ms. Arthur's opinion that Claimant's prognosis was "fair," and could improve with appropriate treatment. (*Id.*) The ALJ stressed that Claimant did not pursue mental health treatment after her evaluation with Ms. Arthur. (*Id.*)

With respect to the other medical opinion evidence, the ALJ assigned "great weight" to Dr. Auvenshine's opinion that Claimant "retains the ability to perform simple, repetitive tasks and is moderately limited in social functioning." (Tr. at 18-19). The ALJ reasoned that Dr. Auvenshine "had the opportunity to review the entire record and his

findings are consistent with the objective medical evidence." (Tr. at 19). With respect to Dr. Roman's and Dr. Comer's opinions that Claimant's mental impairments were nonsevere, the ALJ found that those opinions were entitled to "little weight" because the record contained "persuasive" evidence of a severe mental impairment. (*Id.*)

The Fourth Circuit very recently discussed, in *dicta*, the adequacy of an ALJ's evaluation of medical opinion evidence in *Monroe v. Colvin*, ____ F.3d ____, 2016 WL 3349355, at *11 (June 16, 2016). In *Monroe*, the ALJ assigned "limited weight" to the opinions of two consultative examiners who concluded that the claimant experienced limitations in his ability to sustain attention and effort, construct interpersonal relationships, and master basic directions or procedures reliably and safely. *Id.* at *6, *11. The ALJ explained that the opinions were entitled to "limited weight" because "the objective evidence or the claimant's treatment history did not support the consultative examiner's findings." *Id.* at *11 (quoting the ALJ's decision). The Court determined that the ALJ's reasoning was deficient as "the ALJ did not specify what 'objective evidence' or what aspects of Monroe's 'treatment history' he was referring to." *Id.* Consequently, the Court concluded that the ALJ's "analysis [was] incomplete and preclude[d] meaningful review." *Id.*

The Fourth Circuit also addressed the weighing of opinion evidence in *Fox v. Colvin*, 632 F. App'x 750, 756 (Dec. 17, 2015). In that case, the ALJ assigned "less weight" to a treating physician's opinion regarding the claimant's physical limitations because the ALJ found that the limitations were "not well-supported by the medical record." *Id.* at 752, 756. The Court concluded that the ALJ's "cursory and conclusory" explanation regarding the weight assigned to the physician's opinion prevented meaningful review of the administrative decision. *Id.* at 756. The Court stressed that the ALJ had failed to

explicitly discuss how the physician's opinion was inconsistent with other medical findings. *Id.*

In this case, the ALJ's evaluation of Mr. Sargent's opinion does not permit meaningful review by this Court. To begin, the ALJ failed to mention Mr. Sargent's conclusion that Claimant experienced marked limitation in her ability to respond appropriately to usual work situations and to changes in a routine work setting.[3] Assuming *arguendo* that Mr. Sargent's finding in this area was among those "marked limitations" to which the ALJ assigned "little weight," like *Monroe* and *Fox*, the ALJ here failed to specifically identify the "objective medical evidence of record" that undermined Mr. Sargent's opinion. Although an earlier part of the ALJ's RFC discussion summarizes some medical findings that might conflict with Mr. Sargent's opinion, the ALJ did not cite or discuss these records in discounting Mr. Sargent's opinion regarding the marked limitations experienced by Claimant. The Court is not licensed to scour the administrative record to identify the objective medical evidence on which the ALJ might have relied in rejecting a portion of Mr. Sargent's opinion. *See McDaniel v. Colvin*, No. 2:14-cv-28157, 2016 WL 1271509, at *8 (S.D.W.Va. Mar. 31, 2016) (recognizing that "fact-finding missions" by court are inappropriate in Social Security context); *Jones v. Colvin*, No. 3:15cv307, 2016 WL 424945, at *4 (E.D. Va. Jan. 11, 2016) (stating that courts "will not engage in a fact-finding expedition to remedy [an] ALJ's failure" to sufficiently explain reasons for weight assigned to medical opinion evidence), *report and recommendation adopted by* 2016 WL 438976 (E.D. Va. Feb. 3, 2016). Moreover,

---

[3] The ALJ also neglected to explicitly weigh Mr. Sargent's opinions regarding Claimant's moderate limitations in her ability to make judgments on simple work-related decisions; to understand, remember, and carry out simple instructions; and to interact appropriately with the public, supervisors, and coworkers.

the ALJ's cursory explanation is particularly problematic because evidence existed that supported Mr. Sargent's opinion, including Mr. Sargent's examination findings; Claimant's scores on the Beck Depression Inventory, Second Edition, and the Beck Anxiety Inventory; and Claimant's report of a history of suicide attempts.

In addition, the ALJ failed to sufficiently address Mr. Sargent's opinion that Claimant's concentration was severely deficient. The ALJ discussed Claimant's ability to maintain concentration, persistence, or pace at step three and found that Claimant experienced moderate limitation in the area, without discussing Mr. Sargent's opinion. (Tr. at 15). Throughout the remainder of the written decision, the ALJ never discussed Claimant's ability to maintain concentration, persistence, or pace. While the ALJ may have believed that limiting Claimant to simple, repetitive tasks accounted for any difficulty in concentration, persistence, or pace, and therefore, additional discussion of Claimant's ability in the area was unnecessary, he was incorrect. *See Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015) (holding that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'") (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). Consequently, the ALJ should have explicitly assessed Mr. Sargent's opinion regarding Claimant's ability to maintain concentration, persistence, or pace.

Furthermore, to the extent that the ALJ rejected Mr. Sargent's opinion as "vague," the ALJ's reasoning is entirely unconvincing. (Tr. at 18). First, Mr. Sargent's evaluation report clearly describes his findings and the bases for those findings. (Tr. at 437-39). Second, Mr. Sargent rendered some of his opinions on a form provided and approved by the SSA. (Tr. at 441-43). To criticize the clarity of Mr. Sargent's opinions in filling out a

27

form sanctioned by the SSA is disingenuous, particularly where Mr. Sargent provided specific reasons for the boxes that he checked on the SSA's form. Third, the ALJ assigned "great weight" to the opinion of Dr. Auvenshine, which was no less "vague" than Mr. Sargent's opinion. In fact, the descriptions of the functional limitations contained on the form completed by Dr. Auvenshine are less particular than the functional limitations listed in the form completed by Mr. Sargent. (Tr. at 469-73). Moreover, while Dr. Auvenshine cited specific exhibits in the record to support his functional limitation opinion, he did not explain how those exhibits bolstered his opinion. (Tr. at 469). He ultimately summarized a single treatment record to justify his conclusions. (Tr. at 470). For these reasons, the ALJ's rejection of Mr. Sargent's opinion as "vague" is unsound.

Because the ALJ's reasons for rejecting Mr. Sargent's opinion are perfunctory and conclusory, the ALJ's "analysis is incomplete and precludes meaningful review." *Monroe*, 2016 WL 3349355 at *11. This error was not harmless. As Claimant emphasizes, the vocational expert testified that, if the limitations in Mr. Sargent's opinion were adopted, Claimant would be unable to perform any work that exists in significant numbers in the national economy. (Tr. at 61-62). Accordingly, the Court reverses the Commissioner's decision and remands this case so that the ALJ may analyze Mr. Sargent's findings and conclusions consistent with this opinion. *See Marshall v. Colvin*, No. 1:14CV542, 2015 WL 5970435, at *4-*5 (M.D.N.C. Oct. 14, 2015) (finding that ALJ failed to sufficiently explain reason for discounting consultative examiner's opinion where ALJ concluded that examiner's opinion was entitled to "no weight" because opinion was" fully contradict[ed]" by medical findings without specifically identifying those medical findings); *cf. Farley v. Colvin*, No. 2:15-cv-7183, Dkt. No. 13 at 33-34 (S.D.W.Va. May 12, 2016) (recommending remand where ALJ assigned "little weight" to

treating physician's opinion based on ALJ's belief that "the treatment records [did] not support [the] degree of limitation" because ALJ failed to specify those treatment records which conflicted with the physician's opinion and failed to analyze treatment records anywhere in RFC discussion that would explain weight assigned to physician's opinion); *McCauley v. Colvin*, No. 4:14-cv-4236, 2016 WL 943669, at *2 (D.S.C. Mar. 15, 2016) (remanding where ALJ assigned "little weight to [treating physician's opinion] because of the lack of record support" and concluding that ALJ's explanation did not permit meaningful review); *Stringfield v. Colvin*, No. 7:14-CV-209, 2016 WL 889357, at *7 (E.D.N.C. Feb. 19, 2016) (finding remand warranted where ALJ assigned "little weight" to treating physician's opinion because ALJ believed that opinion was "not consistent with the objective evidence of record" and recognizing that "it was incumbent upon the ALJ to explain his decision to discount [the] opinion, rather than leaving the court to speculate as to what evidence the ALJ believed to be inconsistent and why."), *report and recommendation adopted by* 2016 WL 868197 (E.D.N.C. Mar. 7, 2016).[4]

## VIII.  Conclusion

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is not supported by substantial evidence. Therefore, the Court will **GRANT** Plaintiff's motion for judgment on the pleadings, to the extent that it requests remand, (ECF No. 11); **DENY** Defendant's motion for judgment on the pleadings, (ECF No. 14); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative

---

[4] Although many of these cases considered an ALJ's analysis of a treating physician's opinion, the *Monroe* Court's discussion concerned the opinions of consultative examiners. 2016 WL 3349355, at *11. Moreover, this Court has recognized that "it is good practice" for an ALJ to supply "good reasons" for the weight assigned to an examining source, "so that a reviewing court can properly perform its role." *Starcher v. Colvin*, No. 1:12-1444, 2013 WL 5504494, at *6 (S.D.W.Va. Oct. 2, 2013).

proceedings consistent with this opinion; and **DISMISS** this action from the docket of the Court. A Judgment Order will be entered accordingly.

The Clerk of this Court is directed to transmit copies of this Memorandum Opinion to counsel of record.

**ENTERED:** July 26, 2016

Cheryl A. Eifert
United States Magistrate Judge